<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

KATHLEEN FEELEY,

                       Plaintiff,

v.

NANCY A. BERRYHILL,

                      Defendant.

---

Case No.:  2:17-cv-06881 (PAZ)

**OPINION**

**APPEARANCES:**

JAMES LANGTON
LANGTON & ALTER, ESQS.
1600 ST. GEORGES AVENUE
PO BOX 1798
RAHWAY, NJ  07065
      On behalf of Plaintiff

EDWARD CHARLES TOMPSETT
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
P.O. BOX 41777
PHILADELPHIA, PA  19147
      On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Kathleen Feeley for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401, et seq.).  Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying the application; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes

Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcripts, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court reverses the Commissioner's decision that Plaintiff was not disabled prior to February 16, 2015, and remands the case to the Commissioner for further proceedings in accordance with the following instructions.

## I.  PROCEDURAL HISTORY

On December 23, 2013, Plaintiff filed an application for SSI alleging a disability onset date of September 1, 2013.  (R. 217-18.)[2]  On March 4, 2014, the Commissioner determined that Plaintiff was not disabled and denied the application.  (R. 95.)  Plaintiff filed for reconsideration, and the application was again denied on July 29, 2014.  (R. 109.)  On March 8, 2016, an Administrative Law Judge held a hearing on Plaintiff's application; Plaintiff was represented by counsel at the hearing.  (R. 39-83.)  On April 15, 2016, the ALJ issued a decision denying Plaintiff's application.  (R. 19-38.)  On July 6, 2017, the Appeals Council denied Plaintiff's request for review (R. 1-6), thereby affirming the ALJ's decision as the "final" decision of the Commissioner.  On September 8, 2017, Plaintiff timely filed this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  ECF No. 1.  On May 1, 2018, Plaintiff consented to have a U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28 U.S.C. § 636(c) and

---

[1] In March 2018, the U.S. Government Accountability Office informed the President of its determination that Nancy Berryhill had exceeded the time limit under the Federal Vacancies Reform Act of 1998 allowing her to serve as the Acting Commissioner of the Social Security Administration without the nomination of a successor.  Accordingly, Ms. Berryhill stepped down as Acting Commissioner and continued to lead the agency from her title of record as Deputy Commissioner for Operations.  Id.  In April 2018, Ms. Berry resumed her role as Acting Commissioner.  Patterson v. Berryhill, No. 18-cv-193(DWA), 2018 U.S. Dist. LEXIS 99486 (W.D. Pa. Jun. 14, 2018); see 5 U.S.C. § 3346(a)(2).

[2] "R." refers to the continuous pagination of the administrative record.  ECF No. 5.

Rule 73 of the Federal Rules of Civil Procedure. ECF No. 10.[3] The case was reassigned to the

undersigned Magistrate Judge on September 28, 2018. ECF No. 13.

## II.    LEGAL STANDARD

### A.    Standard of Review

This Court has the authority to conduct a plenary review of legal issues decided by the ALJ

in reviewing applications for Social Security disability benefits. *Knepp v. Apfel*, 204 F.3d 78, 83

(3d Cir. 2000). In contrast, the Court reviews the ALJ's factual findings to determine if they are

supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42

U.S.C. §§ 405(g) & 1383(c)(3). Substantial evidence "does not mean a large or considerable

amount of evidence, but rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and

internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018

WL 1509091, at *4 (D.N.J. Mar. 27, 2018). Thus, substantial evidence is "less than a

preponderance of the evidence, but 'more than a mere scintilla.'" *Bailey v. Comm'r of Soc. Sec.*,

354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL

1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be

set aside merely because the Court "acting de novo might have reached a different conclusion."

*Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Massanari*,

247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial

evidence, we are bound by those findings, even if we would have decided the factual inquiry

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d

4

501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000));

*see K.K.*, 2018 WL 1509091, at \*4.  The Court "need[s] from the ALJ not only an expression of

the evidence s/he considered which supports the result, but also some indication of the evidence

which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ

may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which

[s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186

F.3d 422, 429 (3d. Cir. 1999)).  "[T]he ALJ is not required to supply a comprehensive explanation

for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice."

*Cotter*, 650 F.2d at 482.  Absent such articulation, the Court "cannot tell if significant probative

evidence was not credited or simply ignored."  *Id.* at 705.  As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the
> weight [s/]he has given to obviously probative exhibits, to say that [the] decision is
> supported by substantial evidence approaches an abdication of the court's duty to
> scrutinize the record as a whole to determine whether the conclusions reached are
> rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can

enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or

without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  Remand is appropriate if the

record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or

contradictory findings.  *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210,

221-22 (3d Cir. 1984).  Remand is also appropriate if the ALJ's findings are not the product of a

complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the

record.  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see*

*A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).  A decision to "award

benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518. In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays. *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits." *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

**B.    <u>Standard for Awarding Benefits</u>**

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for Social Security disability benefits based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. §§ 404.1505(a), 416.905(a).[4]  An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Thus, an impairment can be established by objective medical evidence from an acceptable medical source, but cannot be established by a statement of symptoms, a diagnosis, or a medical opinion. *Id*. §§ 404.1521, 416.921.

---

[4] Although the standards for disability are the same under Title II (42 U.S.C. §§ 401, et seq.) and Title XVI (42 U.S.C. §§ 1381, et seq.) of the Social Security Act, these are separate government programs subject different qualification requirements.

The process for determining an adult's claim for Social Security disability benefits involves a five-step sequential inquiry. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a).[5] The claimant bears the burden of proof at Steps One through Four. At Step Five, the burden shifts to the Commissioner. *Id*. §§ 404.1512, 416.912; *see Holley v. Colvin*, 975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014). At each Step, the ALJ must consider the combined effect of all the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step. 20 C.F.R. §§ 404.1523(c), 416.923(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or profit. *Id*. §§ 404.1572(a) & (b), 416.972(a) & (b). If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). At this Step, the ALJ decides whether the claimant has a medically determinable impairment or a combination of such impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is severe if it significantly limits a claimant's ability to perform basic work activities. An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional

---

[5] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. §§ 404.1527 and 416.927.

limitations.  *Id*. §§ 404.1522, 416.922.  If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.  If the claimant's specific impairment is not listed, the ALJ will consider the most closely analogous listed impairment for purposes of deciding medical equivalence.  *Id*. §§ 404.1526(b)(2), 416.926(b)(2).  If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months.  *Id*. §§ 404.1509, 416.909.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work.  20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) either within the last 15 years or within 15 years prior to the disability date.  In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity.  *Id*. §§ 404.1560, 404.1565, 416.945, 416.960.  If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(g), 416.920(g).  If the claimant is incapable of doing so, then s/he is presumed to be disabled if her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms result in exertional and/or non-exertional limitations.  The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling.  *Id*. §§ 404.1569a(a) & (b), 416.969a(b).  Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing manipulative or postural functions such as reaching, handling, stooping, climbing, crawling, or crouching; difficulty tolerating physical features of certain work settings such as dust or fumes; or difficulty maintaining concentration or understanding detailed instructions.  *Id*. at §§ 404.1569a(c), 416.969a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2.  20 C.F.R. §§ 404.1569a(b), 416.969a(b).  The Grid Rules reflect various combinations of RFC, age, education, and work experience, and direct a finding of disabled or not disabled for each combination.  If the claimant also has any non-exertional limitations or cannot perform

substantially all the exertional demands at a given level, then the Grid Rules are used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without considering the additional non-exertional or exertional limitations. *Id.* §§ 404.1569a(d), 416.969a(d).   If the claimant has solely non-exertional limitations, then the Grid Rules provide a framework for decision-making. *Id.* §§ 404.1569a(c), 416.969a(c).

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 45 years old on her alleged onset date (September 1, 2013), and her date last insured was March 31, 2018.  (R. 25, 217.)  At Step One of the decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. 17.)  At Step Two, the ALJ found that Plaintiff has had the following severe impairments since September 1, 2013:  osteoarthritis of the knees bilaterally, lumbosacral disc disease, and depression.  The ALJ also found at Step Two that Plaintiff has had the following additional severe impairments since February 16, 2015:  residual effects of a stroke, obesity, and adjustment disorder.  The ALJ further found at Step Two that the Plaintiff has had the following impairment that was not severe: fibromyalgia.  (R. 25-26.)  At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that were severe enough to meet or medically equal the severity of any Listing.  (R. 26-27.)  At Step Four, the ALJ found that, prior to February 16, 2015, Plaintiff had the RFC to perform sedentary work subject to various exertional and non-exertional limitations.  The ALJ also found at Step Four that, beginning on February 16, 2015, Plaintiff was subject to additional exertional limitations.   The ALJ further found at Step Four that, since September 1, 2013, Plaintiff has been unable to perform past relevant work as a teacher's aide. (R. 27-32.)  At Step Five, the ALJ found that, since September 1, 2013, a finding of not disabled would be directed by Grid Rule 201.21 if Plaintiff had the RFC to perform the full range of

sedentary work.  The ALJ also found at Step Five that least 3 jobs – order clerk, addresser, and table worker – existed in significant numbers in the national economy and could be performed by an individual with Plaintiff's age, education, work experience, and RFC.  The ALJ further found at Step Five that, beginning on February 16, 2015, no jobs existed in the national economy that could be performed by an individual with Plaintiff's age, education, work experience, and RFC.  (R. 33-34.)  The ALJ therefore concluded that Plaintiff was not disabled prior to February 16, 2015, but became disabled on that date and continued to be disabled through the decision date (April 16, 2015).  (R. 34.)

Plaintiff attacks the ALJ's decision that she was not disabled prior to February 16, 2015.  Her attack is threefold.  First, Plaintiff contends that the ALJ erred by failing to consider obesity as an impairment during the relevant period between September 1, 2013 and February 15, 2015.  Second, Plaintiff contends that the ALJ erred at Step Four because the RFC finding did not include all credibly established limitations.  Third, Plaintiff contends that the ALJ erred at Step Five because the jobs identified by the VE fell outside the parameters of the hypothetical questions.  Plaintiff asks the Court to reverse and remand for payment or, alternatively, for a new hearing.[6]  Defendant does not dispute the ALJ's decision that Plaintiff became disabled on February 16, 2015.  As to the preceding period, Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence.

---

[6] The "opening statement" and "summary of argument" sections of Plaintiff's brief request that the Court reverse the ALJ's denial of benefits and remand for payment (ECF No. 11 at 1, 9), but this is merely boilerplate.  Plaintiff repeatedly requests throughout the remainder of her brief that the Court remand for a new hearing.  *See id.* at 19, 25, 37.

## IV.    SUMMARY OF RELEVANT EVIDENCE[7]

### A.    __Medical Evidence.__

#### 1.    __Treating Providers.__

In January 2009, Dr. Jeffrey M. Warshauer (orthopedic surgery) evaluated Plaintiff for progressive bilateral knee pain.  Physical examination findings were:  mild varus deformities; 3-5 degree extensor lags and flexes to approximately 120 degrees; tricompartmental crepitance; ability to straight leg raise; and no gross instability.  Bilateral knee x-rays revealed mild degenerative changes on the left and moderate arthrosis on the right.  Dr. Warshauer diagnosed bilateral degenerative joint disease of the knees.  He ordered Synvisc for Plaintiff to try Visco supplementation.[8]  In June 2009, a bilateral knee MRI revealed: on the right, degenerative change of the patellofemoral articulation with spurring at the lateral patellar and trochlear margins; on the left, myxoid change of the posterior horns of the medial and lateral menisci; on the left, marked degenerative change of the lateral patellofemoral articulation with spurring at the lateral patellar and trochlear margins; and bilateral multiple osteochondral erosions of the lateral patellar facet and lateral trochlear surface.  (R. 348-52.)

There is scant medical evidence from treating providers from the relevant period between September 1, 2013 and February 15, 2015.  Neither party cites treatment notes from Dr. John

---

[7] The Local Rules require that a plaintiff's brief include both a "statement of the case" (indicating briefly the course of the proceeding and its disposition at the administrative level) and a separate statement of facts (with references to the administrative record).  Local Civ. R. 9.1(e)(5)(B) & (C).  Plaintiff's brief contains a one-paragraph section entitled "Procedural History/Statement of Facts" that is devoid of any facts.  ECF No. 12 at 1-2.  This omission hampers the Court's ability to understand and analyze Plaintiff's arguments and is a failing that should not be repeated by counsel in future submissions to the Court.

[8] Visco supplementation is a procedure in which a gel-like fluid called hyaluronic acid is injected into the knee joint.  Hyaluronic acid is a naturally occurring substance found in the synovial fluid surrounding joints that acts as a lubricant to enable bones to move smoothly over each other and as a shock absorber for joint loads.  *See* https://orthoinfo.aaos.org/en/treatment/viscosupplementation-treatment-for-knee-arthritis/.

Joseph Smith (internal medicine) for the period from October 2007 to February 2014. Dr. Smith's treatment notes from the relevant period indicate that Plaintiff weighed 200 pounds in March 2013, 196 pounds in July 2013, 197 pounds in August 2013, 198 pounds in January 2014, and 190 pounds in February 2014. Dr. Smith treated Plaintiff during this period for routine medical issues, and the only musculoskeletal or neurological complaint that Plaintiff expressed was lower back pain. (R. 298-387, 431-74.)

In January 2014, Plaintiff was admitted to Liberty Health Jersey City Medical Center. She was initially diagnosed with lumbago (lower back pain) but was subsequently diagnosed with renal colic and calculus stones. She was released the same day with instructions to follow-up with a urologist. Plaintiff self-reported that she weighed 190 pounds. (R. 383-418.) In March 2014, Plaintiff requested from Dr. Traci Tamburello (family medicine) referrals for a rheumatologist, nephrologist, and podiatrist. Plaintiff's weight was noted at 144 pounds with a BMI of 23.24 for her height of 5'6" tall. In April 2014, Plaintiff was evaluated by Dr. Carl Restivo (rheumatology). Her weight was noted at 190 pounds. Dr. Restivo diagnosed osteoarthritis, bursitis shoulders/hips, and cervical spondylosis. During an April 2014 follow-up with Dr. Tamburello, Plaintiff requested refills of her Ambien and Alprazolam prescriptions. When Dr. Tamburello cautioned that these medications were for short-term periodic use, Plaintiff responded that she had been taking them "for a long time." Dr. Tamburello gave Plaintiff sleep medicine and psychiatry referrals "for further evaluation due to the long term use of these medications." Plaintiff's weight was again noted at 144 pounds with a BMI of 23.24 for her height of 5'6". During a May 2014 follow up with Dr. Restivo, Plaintiff's weight was noted at 188 pounds. Dr. Restivo diagnosed osteoarthritis, sciatica, cervical spondylosis, adhesive capsulitis, and subdeltoid bursitis shoulders. (R. 475-523.)

2.    **Consultative Examiners.**

On February 11, 2014, Dr. Anthony Candela (psychologist) performed a consultative evaluation.  In a report issued on the same date, Dr. Candela advised that Plaintiff is 5'6" tall, weighs 170 pounds, and indicated that she had to stop work in August 2013 because she was "too sick."  Plaintiff stated that she stopped driving over the past year because of anxiety; she was hospitalized once about six years ago for depression and anxiety after losing her job; and she had no prior mental illness other than undiagnosed anxiety her entire life.  She also stated: "I am better with medication but I still scream at times.  I cry and throw things.  I am upset from time to time but the medication helps a lot and my sleeping is better."  Plaintiff stated that she was prescribed Xanax over 14 years ago and continues to take Xanax 0.25mgs BID and Zolpidem 10mgs HS as prescribed by her primary care physician.  Dr. Candela's mental evaluation included in relevant part:

> From a cognitive point of view she is functioning on a Low Average Level of Intellectual Ability.  She was able to repeat five digits forward, two backwards, with limited concentration to serial fives.  She was very preoccupied.  She made three or four mistakes within the first five or six calculations.  She knew the president, the governor, the day, the month, and the year.  She was able to spell the word "WORLD" forwards but not backwards, only three out of five letters correctly.  She could recall one out of three items after three minutes and none after five minutes.

> She denies any auditory or visual hallucinations, no delusions, no psychosis, no schizophrenia, and no formal thought disorder was noted or elicited.  She was alert, attentive, and oriented in all three spheres.  She denies any panic attacks, phobic reactions or any paranoid thinking.  There was no loosening of association, no tangentiality, and no circumstantiality.

> Affect was full.  Mood was depressed, mildly so.  Insight, judgment, and reasoning were good.

> She is depressed.  She appeared to be depressed in the office.  She presented with some depressive symptomatology, but this was quite mild.  She is not suicidal or homicidal.  There are no symptoms of anhedonia  She is not isolated or withdrawn.  There are no impulse control difficulties.

Dr. Candela diagnosed adjustment disorder, with depressed mood, mild, recurrent, DSM-V.  (R. 419-22.)

On February 12, 2014, Dr. Justin Fernando (thoracic surgery) completed a Passive Range Of Motion Chart.  He opined that Plaintiff demonstrated:  130 degrees bilateral knee flexion-extension, with a notation that she "put up a great deal of resistance to passive ROM;" no more than 15-20 degrees movement in any direction of her cervical spine; limited range of motion in her lumbar spine; inability to squat; no muscle weakness, sensory loss, or reflex loss; and ability to walk at a reasonable pace without a hand-held assistive device.  A lumbar spine MRI on February 17 revealed osteopenia and degenerative changes most pronounced at the L1-L2 level. On February 18, Dr. Fernando performed a consultative examination.  In a report issued on the same date, Dr. Fernando advised that Plaintiff is 5'4" tall, weighs 190 pounds, and indicated that she lost her job in August 2013.  Physical examination findings included:

> In the lower extremities, she put up a good deal of resistance when trying to do some passive range of motion exercises in both her knees.  Structurally, neither knee shows any abnormality in the form of joint line tenderness or chronic changes in the soft tissue in either knees, none could be found, but despite her resistance flexion and extension was found to extend to about 130 degrees bilaterally.  Both hips and ankles were capable of full range of motion.  There is no indication of any muscle atrophy or sensory abnormality between the 2 sides.  The deep tendon reflexes were found to be brisk qualifying for a 2+ response of both quadriceps and at both Achilles tendons bilaterally.  In the examination of the spine, any direction that she was asked to move her head, was met with performance that did not exceed 15-20 degrees at most.  She claimed to have pain regardless of which way she looked.  Pain and restriction was barely noticeable when she was not being closely scrutinized.  In the lumbar spine, flexion and extension did not exceed 60 degrees and lateral flexion was kept within 45 degrees bilaterally, but sitting upright she was able to extend both legs to 90 degrees.  Strength in the lower extremities is estimated to be 5/5 without any evidence of any muscle atrophy or sensory abnormality in the lower extremities.

(R. 426.)  Dr. Fernando opined:

From an orthopedic standpoint, there was hardly recognizable clinical indication of any abnormality that would even remotely suggest[] morphological changes consistent with arthritis in any of the joints of the extremities. If she has arthritis in her spine, it is possible given the kind of restriction she placed on the movement of the spine, particularly the cervical spine. It is conceivable that arthritic changes exist in her spine from cervical down to the lumbar spine without the assistance of any impingement on the nerve roots based on the quality of the reflexes in the upper and lower limbs. Her joint pains including the pain in her spine could be due to arthritic changes that cannot be fully appreciated in a physical examination. The clinically important aspect of the exam is the fact that she has not yet seen a urologist as recommended by the clinic doctor who had identified the cause of her back and flank pain being partially opened contributed to by a large calculus in her right kidney.

(R. 426-27.) Dr. Fernando diagnosed: "(1) chronic pain in the spine, cervical and lumbar (with no indication of any tenderness over the spine or the paraspinal areas and no indication of disk involvement or nerve impingement in the cervical and lumbar spine); and (2) history of rheumatoid arthritis (no clinical indication exists of morphology in any of her joints that would remotely suggest the presence of rheumatoid arthritis)."

### 3. State Agency Reviewing Consultants.

In March 2014, State Agency reviewing consultants opined that:

- Plaintiff could perform light work subject to the following limitations: frequently lift/carry up to 10 pounds in an 8-hour day and occasionally lift/carry up to 20 pounds in an 8-hour day; stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour day; sit (with normal breaks) for a total of 6 hours in an 8-hour day; frequently balance or stoop; and occasionally kneel, crouch, crawl, or climb ramps, stairs, ladders, ropes, and scaffolds.

- Plaintiff did not satisfy paragraphs A, B, or C for Listing 12.04 (Affective disorders). As to the paragraph B criteria, she had mild restrictions in activities of daily living; mild difficulties in maintaining both social functioning and concentration, persistence, or pace; and no repeated episodes of decompensation.

- Plaintiff was not significantly limited in the ability to: remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain an ordinary routine without special supervision; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; get along with coworkers

or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.

- Plaintiff was moderately limited in the ability to: maintain attention and concentration for extended periods; work in coordination with or in proximately to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and accept instructions and respond appropriately to criticism from supervisors.

- Plaintiff was markedly limited in the ability to: understand, remember, and carry out detailed instructions.

- "[T]he totality of the evidence in the file reveals that the [claimant] does have a psychiatric impairment, but the limitations imposed by that impairment are not so severe that they prevent the claimant from understanding and performing simple routine/repetitive tasks, nor from meeting the basic mental demands of simple work.

(R. 84-94.) In July 2014, State Agency reviewing consultants concurred with the initial opinions.

(R. 96-108.)

### 4. Medical Experts.

#### (a) Dr. Mark Farber.

Dr. Mark Farber (internal medicine and pulmonary disease) was questioned during the March 2016 hearing by both the ALJ and Plaintiff's counsel. (R. 46-51.) Based on Dr. Warshauer's January 2009 evaluation report and Plaintiff's June 2009 bilateral knee MRI results, Dr. Farber testified that Plaintiff had bilateral osteoarthritis of the knee. He explained:

> They describe it as the degenerative change of the patellofemoral joint. That's just where the kneecap meets the muscle above it. So it's just arthritis of the kneecap basically. So she has osteoarthritis of the knees that they thought was marked on the left side and not marked on the right side.

(R. 48.) Dr. Farber further explained: "It's – now in six years or six and half years, that kind of problem gets worse unless there was some sort of tentative treatment. I guess she was considering all the injections. They didn't have anything meaningful that I know of." (R. 48.) He also noted,

per Dr. Fernando's February 2014 report, that Plaintiff was 5'4" tall and weighed 190 pounds, which indicated a BMI that was "certainly probably about 35 or it's over 30, so she is obese, and that affects her ability to ambulate."  (R. 49.)  Dr. Farber opined:

> [Plaintiff] would be, in my opinion, restricted to sedentary work as of 2009 because I think that you have both knees involved.  You have somebody who is significantly overweight and one of the knees at that time showed marked degenerative – severe degenerative changes and that would be – so the ambulation in my opinion could not exceed two hours in an eight-hour day for standing and/or walking. … And then there would be some – no upper extremity restrictions.  The weight would be ten pounds, occasionally, to lift and/or carry and sit up to six hours in an eight-hour day with the usual breaks, stand and/or walk for up to two hours in an eight-hour day with usual breaks.  Foot controls would be no foot controls on the left side and only five pounds or less on the right side.  Upper extremity restrictions would not be in place in terms of handling, fingering, manipulation, reaching in all directions and reaching overhead except for the sedentary restriction.  And then of course, there would be no ropes, no ladders, no unprotected height.  There would  be no moving machinery, no uneven surfaces, no balancing, no kneeling, no crawling, occasional bending and stooping and occasional stairs and ramps, and no exposure to extremes of heat or cold because of this osteoarthritis.  And that's, of course, not having reviewed anything about her later condition. … That would [be] through as of 2009, the beginning of 2009, that RFC.

(R. 50-51.)  When questioned by the ALJ about Plaintiff's RFC after 2009, Dr. Farber responded:

> Well it doesn't get any better, Judge.  In other words, she never had anything done to her knees, so if she had these changes in 2009 on an MRI, there's no way that they could get better and … she has – in other words, those conditions unless treated in some definite way, only get worse.  So she had lumbosacral disc disease in 2009.  She had significant severe degenerative changes in one of her – in her left knee and more milder changes in her right knee.  There's no way that they could have improved.  They have to be worse actually. … And perhaps her resistance on [Dr. Fernando's] exam was because she had pain.

(R. 51.)  In response to questions from Plaintiff's counsel, Dr. Farber testified:

- He could not answer whether Plaintiff might have benefitted in 2014 from use of a cane because he had not examined her and did not know if another doctor had prescribed one.

- He did not believe that Plaintiff's pituitary adenoma/hypothyroidism would have much bearing on Plaintiff's ability to perform sedentary work.

- His RFC analysis considered that Plaintiff was obese. (*See* R. 56 ("As I said, I gave her credit for the fact that she weighed 190 pounds and was 5'4" tall. I took the weight into consideration when I gave the Judge [the RFC] I thought was appropriate.").)

(R. 52-57.)

> *b)*     ***Dr. Daryl P. Didio.***

Dr. Daryl P. Didio (psychology) was also questioned during the March 2016 hearing by both the ALJ and Plaintiff's counsel. (R. 58-69.) Dr. Didio was not comfortable opining that Plaintiff had marked difficulties with "the usual B criteria" prior to her stroke in April 2015, but he was confident that she had no more than a mild depressive disorder before then. The disorder was sometimes diagnosed as an adjustment disorder and sometimes fibromyalgia, which is often related and associated with dysthymia. Dr. Didio did not agree that Plaintiff had schizoaffective disorder prior to 2015. He also highly doubted the accuracy of the diagnosis in 2015 because schizophrenia often presents early in life, generally between the teenage [years] to early twenties. He suggested that, just prior to her stroke, Plaintiff had organic (i.e., medical) difficulties that masqueraded as schizophrenia.

## B.    <u>Non-Medical Evidence.</u>

In January 2014, Plaintiff submitted a Function Report. She stated that she lived in an apartment with her husband. She had difficulty putting on her pants and getting into and out of the bathtub; she also experienced knee pain when sitting on the toilet. She could not sleep at night because of shooting pain. She cooked simple meals, microwaveable food, canned goods, and sandwiches. She spent at least 45 minutes to 1 hour cooking on a daily basis; she could not bend to reach pots and pans, nor she could lift them up. She spent 1-2 hours doing light cleaning and laundry (without specifying any frequency) but needed encouragement to do so because of pain. She went outside daily and traveled as a passenger in a car or by taxi; she preferred not to go out

alone and did not drive.  She shopped for 3-4 hours every 2 weeks for groceries and clothing both in stores and online.  She was able to handle finances.  She spent time every day watching television, using a computer, and talking to friends.  She attended church on a regular basis but was not able to meet up with friends as often as she used to.  She got "snappy" at times with friends, neighbors, and relatives.  She was unable to navigate stairs or to walk for long periods of time.  She could walk 1-2 blocks before needing to rest for at least 10-15 minutes.  She had difficulty: sitting, standing, lifting, squatting, bending, kneeling, reaching, and understanding; and with memory, understanding, following instructions, completing tasks, and getting along with others.  She could pay attention for 5-10 minutes, did not handle stress very well, and took a long while to adapt to changes in routine.  She felt depressed and anxious.  She was prescribed eyeglasses in 2009 or 2010 and wore them daily.  (R. 243-51.)

In March 2016, Plaintiff testified during the hearing, where she was questioned by both her counsel and the ALJ.  Plaintiff had a stroke in April 2015 that affected the right side of her brain (i.e., the left side of her body from her face to her legs).  Prior to her stroke, she used a cane.  After her stroke, she used a cane and a walker while at home and a wheelchair when she went out.  Her alleged disability date is September 1, 2013, when she was told that she could not work anymore because she had physical problems and was both schizophrenic and bipolar.  She never had knee replacement surgery.  (R. 42-45, 48, 51-52.)

The Court discusses in Section V.C. below the portions of the VE's hearing testimony that are relevant to this appeal.

## V.    DISCUSSION

### A.    Obesity.

Plaintiff argues that, because the ALJ incorrectly found that she was not obese prior to February 16, 2015, the ALJ committed reversible error by not considering Plaintiff's obesity during the relevant period at Steps Three and Four.  *See* ECF No. 11 at 25 ("But the decision does not combine obesity and knee and back pathology at the step 3 listing level and doesn't include obesity in the RFC between September 2013 and February 2015 because the decision claims that plaintiff was not obese during this period.")  The Court agrees that remand is warranted for the reasons set forth below.

The ALJ found:

> During the consultative examination, the claimant was five feet, six inches and 170 pounds [i]n February 2014.  Thus, her BMI at this time was 27.4 within the overweight range but not obese.  However, the medical expert testified that the claimant[] became obese after the established onset date [February 16, 2015] with a body mass index of 35, which would affect her ability to ambulate further.

(R. 28 (citing "Hearing Testimony").)  This finding is problematic in several respects.  First, the record contains conflicting information about Plaintiff's height and weight during the relevant period.  Dr. Smith's January and February 2014 treatment notes indicate that Plaintiff weighed, respectively, 198 and 190 pounds; Dr. Candela's February 2014 report indicates that Plaintiff was 5'6" tall and weighed 170 pounds (BMI 27.4); Dr. Fernando's February 2014 report indicates that Plaintiff was 5'4" tall and weighed 190 pounds (BMI 32.6); Dr. Tamburello's March and April 2014 treatment notes indicate that Plaintiff was 5'6" tall and weighed 144 pounds (BMI 23.2); and Dr. Restivo's April and May 2014 treatment notes indicate Plaintiff weighed, respectively, 190 and 188 pounds.  (Drs. Smith and Restivo did not note Plaintiff's height.)  The ALJ's decision neither mentioned this conflicting data nor explained why it was rejected in favor of Dr. Candela's

data.  Second, the ALJ misstated Dr. Farber's testimony.  Dr. Farber testified:  "In my opinion, [Plaintiff] also weighed – at that time on her internal medicine exam that she's 5'4" tall and weighed 190 pounds.  So BMI is certainly probably about 35 or it's over 30, so she is obese, and that affects her ability to ambulate."  (R. 49.)  Thus, Dr. Farber *did* opine that Plaintiff was obese during the relevant period because, based on Dr. Fernando's February 2014 report, her BMI exceeded 30 (not 35).  The Court cannot meaningfully review the ALJ's obesity analysis for the relevant period absent an indication that the ALJ analyzed all relevant evidence and provided adequate explanation.

Nevertheless, remand is warranted only if the ALJ's error in this regard was not harmless.  Plaintiff bears the burden of explaining how the ALJ's decision would change if substantial evidence supported a finding that Plaintiff were obese during the relevant period.  *See Woodson v. Comm'r of Soc. Sec.*, 661 F. App'x 762, 766 (3d Cir. 2016) (plaintiff must "explain[] how, even if the ALJ's analysis was lacking, the deficiency was harmful to [her/]his claims," including "affirmatively point[ing] to specific evidence that demonstrates [s/]he should succeed"); *Gullace v. Comm'r of Soc. Sec.*, No. 15-cv-7630 (FLW), 2017 WL 714356, at *10 (D.N.J. Feb. 23, 2017) (citing *Woodson*).  At Step Three, Plaintiff offers no argument that her obesity during the relevant period (by itself) is medically equivalent to any specific Listing, nor does she explain with citation to record evidence why her obesity during the relevant period (in combination with other impairments) meets or is medically equivalent to any specific Listing.  Social Security Ruling 02-1p, *Titles II & XVI: Evaluation of Obesity*, 2000 WL 628049 (S.S.A. Sep. 12, 2002); *see, e.g., Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (harmless error where claimant complained "in vague terms that certain impairments were not properly compared, separately and in combination, to the listings" without identifying "specific avenues for meeting

or equaling specific listings that the ALJ should have considered but did not"). At Step Four, the ALJ adopted almost the entirety of Dr. Farber's RFC for 2009 – an RFC that Dr. Farber confirmed (in response to questioning from Plaintiff's counsel) incorporated limitations attributable to Plaintiff's obesity as calculated at the height and weight reported in Dr. Fernando's February 2014 report. Thus, the ALJ's RFC *for the relevant period* considered Plaintiff's obesity based on what Plaintiff asserts were the "real numbers" for her height, weight, and BMI (ECF No. 11 at 24). The Court therefore finds that remand is not warranted because the error in the ALJ's obesity analysis was harmless.

### B. Step Four.

At Step Four, the ALJ found that prior to February 1, 2015, Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 CFR § 404.1567(a) except:

> [T]he claimant is limited to lift and/or carry up to 10 pounds occasionally and 10 pounds frequently; stand and/or walk with normal breaks for a total of about 2 hours in an 8-hour workday; sit with normal breaks for a total of about 6 hours in an 8-hour workday; can climb ramps and stairs occasionally; can never climb ladders, ropes, and scaffolds; can balance, crouch, squat, and kneel occasionally but never crawl; never operate foot controls or pedals with the bilateral lower extremities; and can never be exposed to workplace hazards, such as machinery, motor vehicles, unprotected heights, or vibrations. Additionally the claimant has non-exertional limitations, where the claimant is limited to simple, routine, and repetitive tasks that can be explained, within an SVP 1 or SVP 2, which involve making simple decisions and only occasional changes in routine.

(R. 20.) Plaintiff contends that "[t]he Commissioner did not carry her burden of proof at the fifth step of the sequential evaluation." ECF No. 11 at 25-26. However, most of this section of Plaintiff's brief is devoted to the ALJ's failure to include in the RFC finding all credibly established limitations. These alleged errors involve Step Four, where the burden of proof rests with Plaintiff. The Court agrees with Plaintiff that remand is warranted because substantial evidence did not support the ALJ's RFC finding in the following three respects.

First, after describing Dr. Farber's 2009 RFC, the ALJ stated:

> Though the undersigned does not adopt all of Dr. Farber's findings, his overall opinion of sedentary capacity is supported by the claimant's medical treatment record, which found range of motion limitations and degenerative changes in the claimant's lumbar spine but no more significant findings. However, the claimant reported in her function report, that she was able to cook, clean, and shop. Therefore, Dr. Farber's opinion is given partial weight.

(R. 30.)  A comparison of Dr. Farber's RFC and the decisional RFC reveals the following:

- The ALJ adopted Dr. Farber's opinion that Plaintiff could:  occasionally lift/carry up to 10 pounds; stand/walk up to 2 hours with regular breaks during an 8-hour workday; sit up to 6 hours with regular breaks during an 8-hour workday; occasionally climb ramps/stairs; never climb ladders/ropes or crawl; never operate foot controls or pedals using her left lower extremity; and never have exposure to moving machinery or unprotected heights.

- The ALJ added that Plaintiff could:  never climb scaffolds and occasionally squat (not mentioned in Dr. Farber's opinion); never operate foot controls or pedals using her right lower extremity (Dr. Farber opined that she could operate up to 5 pounds); and never have exposure to motor vehicles or vibrations (not mentioned in Dr. Farber's opinion).

- The ALJ rejected Dr. Farber's opinion that Plaintiff could:  never balance, crouch, or kneel and instead found that she could do so occasionally.

- The ALJ rejected Dr. Farber's opinion that Plaintiff could: occasionally stoop or bend and instead found no limitation.

- The ALJ rejected Dr. Farber's opinion that Plaintiff could:  never have exposure to uneven surfaces or extreme temperatures and instead found no limitation.

The Court is troubled by the ALJ's statement that the "significant findings" in Plaintiff's "medical treatment record" are limited to the "range of motion limitations and degenerative changes in the claimant's lumbar spine" reflected in Dr. Fernando's February 2014 report and Plaintiff's 2014 lumbar spine x-rays.  The ALJ summarily noted Dr. Warshauer's 2009 evaluation and Plaintiff's 2009 bilateral knee MRI.  (R. 28.)  The ALJ characterized Dr. Farber's testimony as opining that Plaintiff was limited to sedentary work because of "pain in her knees, her obesity, and the degenerative changes in her lumbar spine."  (R. 29).  In fact, Dr. Farber testified:  "[Plaintiff]

would be, in my opinion, restricted to sedentary work as of 2009 because I think that you have

both knees involved. You have somebody who is significantly overweight and one of the knees

at that time showed marked degenerative – severe degenerative changes[.]" Dr. Farber did not

opine about limitations from Plaintiff's back impairment because there was no evidence in the

record of such impairment in 2009. Moreover, the ALJ never mentioned or analyzed Dr. Farber's

testimony regarding the severity of Plaintiff's knee impairment based on his review of her 2009

MRI; the lack of treatment options for this impairment; or that Dr. Fernando did not appear to have

reviewed the 2009 MRI. The Court is also troubled by the ALJ's finding that Plaintiff's daily

living activities support the decisional RFC. Plaintiff's ability to cook simple meals for 1 hour

each day, do light cleaning and laundry, and shop in stores and online every 2 weeks for 3-4 hours,

is not inconsistent with any of the rejected limitations.

Second, Dr. Farber testified that "there's no way that [Plaintiff's knee impairment] could

have improved [since 2009]. They have to be worse actually. And perhaps her resistance on the

[2015] exam was because she had pain." (R. 51.) The Court rejects Plaintiff's unsupported

assertion that "the unmistakable thrust of Dr. Farber's testimony" was "the predictable medical

probability that by the time plaintiff reached the date of her alleged onset, September 1, 2013, she

would be unable to perform the sitting, standing/walking and lifting/carrying requirements of

sedentary work that she was deemed capable of 4 years earlier in 2009." ECF No. 11 at 14; *see*

*id*. at 17 (decision "never even hints at [Dr. Farber's] conviction that plaintiff's RFC for sedentary

work undoubtedly deteriorated after 2009"); *id*. at 36 ("Dr. Farber's opinion … clearly eliminates

plaintiff's exertional ability to sustain sedentary jobs by the alleged onset date of September,

2013[.]") Dr. Farber did *not* opine as to Plaintiff's RFC beyond 2009, and his opinion that

Plaintiff's knee impairment may have worsened (or was likely to worsen) after 2009 is not prima

facie evidence of an inability to do sedentary work between September 1, 2013 and February 15, 2015.  However, Dr. Farber's opinion regarding the severity of Plaintiff's knee impairment during the relevant period should have been considered in fashioning the RFC finding.  Since the decision is silent as to Dr. Farber's opinion in this regard, the Court cannot meaningfully review if or how the opinion is reflected in the RFC finding.

Third, the only non-exertional limitations in the RFC finding attributable to Plaintiff's mental impairment limit her "to simple, routine, and repetitive tasks that can be explained, within an SVP 1 or SVP 2, which involve making simple decisions and only occasional changes in routine."  The ALJ explained:

> [T]he state agency's psychological medical consultants' assessments are given great weight.  They found mild restrictions to activities of daily living and social functioning and moderate limitations to concentration, persistence, and pace.  Though the undersigned does not adopt the entire opinions, they are consistent with Dr. Candela's mental evaluation findings, where the claimant demonstrated a low average intellectual level with limited concentration and a mildly depressed mood, her affect was full and she demonstrated good insight, judgment, and reasoning.

(R. 30.)  However, Dr. Candela also found that Plaintiff:  had limited concentration to serial fives; was very preoccupied; made three or four mistakes within the first five or six calculations; was not able to spell word "WORLD" backwards (only three out of five letters correctly); and could recall one out of three items after three minutes and none after five minutes.  Dr. Candela's findings appear consistent with the State Agency consultants' opinions – rejected by the ALJ – that Plaintiff was moderately limited in the ability to:  maintain attention and concentration for extended periods; work in coordination with or in proximately to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Since the decision is silent as to both Dr. Candela's and the State Agency consultants'

opinions in this regard, the Court cannot meaningfully review if or how the ALJ considered an

RFC limitation as to Plaintiff's production pace or need to be off-task.

    **C.**    **Step Five.**

    The VE testified in response to questioning from both the ALJ and Plaintiff's counsel that:

- Plaintiff had the RFC to perform the jobs of food order clerk (DOT 209.567-014) and addresser (DOT 209.587-010).  Both are classified by the DOT as sedentary, unskilled jobs with a specific vocational profile (SVP) of 2.  There are 1,196 food order clerk jobs in the national economy and 11,083 addresser jobs in the national economy.

- The DOT description of the food order clerk job – which was last updated in 1977 – involves the taking of food and beverage orders over telephone or intercom system and recording orders on tickets.  Today, some food order clerk jobs require the entry of information into a computer.  A "high chain hotel like the Plaza" is probably using computers but a smaller or medium size restaurant is still taking orders by handwritten slip.  If the job required use of "some sophisticated computer program," then the job "would be higher than an SVP 2."  He could not estimate the percentage of jobs in the national economy that either use handwritten slips or computers.

- The DOT description of the addresser job – which was last updated in 1977 – involves the addressing by hand or typewriter of envelopes, cards, advertising literature, packaging, and similar items for mailing.  Today, the addresser job is "probably a word-processing operation, which uses a keyboard" and "most likely … would incorporate a computer."  If the job required use of "a computer and a program that involves Word," then the job "probably is an SVP higher than 2."

(R. 73-75, 77.)  Noting that the decisional RFC limits Plaintiff to SVP 1 or SVP 2 jobs, Plaintiff

argues that the Commissioner has not presented substantial evidence that Plaintiff can perform the

food order clerk or addresser job because each is performed in today's economy at SVP 3 or higher

or, alternatively, because the VE could not identify how many of these jobs are performed in

today's economy at SVP 2.[9]  Defendant relies on Judge Cecchi's recent decision in *Sanabria v.*

---

[9] Plaintiff also argues that the third job identified by the VE – table worker – falls outside the parameters of the RFC finding because the VE testified that the job requires an ability to remain on-task with sufficient speed for examining items on a conveyor belt.  As previously noted, this is not an argument related to the

*Commissioner of Social Security*, No. 15-cv-8963, 2017 WL 436253 (D.N.J. Jan. 31, 2017), a case

in which the claimant was also represented by Plaintiff's counsel:

> Although Plaintiff may disagree with the relevance of the [DOT] in the modern-day work force, "the DOT remains an appropriate source of occupational data. Under 20 C.F.R. § 404.1566(d)(1), the Social Security Administration may take administrative notice of job information from the DOT." *Coates v. Colvin*, No. CIVA 14-0265, 2014 WL 4792199, at *4 (W.D. Pa. Sep. 24, 2014) (quoting *Devault v. Astrue*, Civ. No. 2:13-cv-0155, 2014 WL 3565972, at *6 (W.D. Pa. Jul. 18, 2014)). "Social Security Ruling 00-4p sets forth that the relevant inquiry is whether VE testimony is consistent with the DOT." *Id*. Plaintiff's argument is essentially that the Regulations should require more, which is not for this Court to decide. "A vocational expert may rely on the DOT, and the ALJ may rely on the VE's testimony to the extent it is consistent with the DOT." *Estevez v. Comm'r of Soc. Sec.*, No. CV 14-6337 (KM), 2016 WL 3381227, at *7 (D.N.J. Jun. 8, 2016) (citing 20 C.F.R. § 404.1566(d)(1)); *Jiminez v. Colvin*, No. 15-3762 (KM), 2016 WL 2742864, at *9 (D.N.J. May 11, 2016).

*Sanabria*, 2017 WL 436253, at *4 (finding ALJ's Step Five analysis supported by substantial

evidence where ALJ relied on VE testimony consistent with DOT). *See* ECF No. 12 at 13.

The Court need not resolve this dispute having found that the case must be remanded for a

new RFC finding at Step Four – which may or may not result in a new Step Five finding. However,

the Court observes that it may prove useful on remand to develop the record as to Plaintiff's

computer proficiency given the statements in her Function Report that she uses a home computer

daily and regularly shops online. *Cf.* DOT, App. C, Section I (SVP 2 job requires "[a]nything

beyond a short demonstration up to and including 1 month to "learn the techniques, acquire the

information, and develop the facility needed for average performance in a specific job-worker

situation").

---

ALJ's Step Five finding. It is an argument that the ALJ erroneously failed at Step Four to include a production pace and/or off-task limitation, which the Court has addressed above.

## V.      CONCLUSION

For these reasons, the Court reverses the Commissioner's decision that Plaintiff was not disabled prior to February 16, 2015, and remands the case to the Commissioner for further proceedings in accordance with the preceding instructions.[10]


Dated:   March 20, 2018                         ___s/ Paul A. Zoss___
At Newark, New Jersey                       PAUL A. ZOSS, U.S.M.J.

---

[10] Plaintiff contends that "[t]his matter must be remanded to a different ALJ for a de novo hearing and decision" because it is "clear in light of the decision's misstatements and crucial omissions that the ALJ's recitation and analysis of the evidence betrays a goal-directed version of the facts inconsistent with the actual testimony relied upon to deny benefits."  ECF No. 11 at 37; *see id*. at 25 ("given this ALJ's casual relationship with the actual evidence and testimony, this Court should order a remand to a different ALJ"). The Court denies this request.  Having reviewed the entire record, the Court finds this to be an inaccurate ad hominem attack on the ALJ.  Plaintiff was afforded a full and fair hearing; "there is no indication that there was any conflict of interest or inability to render a fair judgment."  *Fraser v. Astrue*, 373 F. App'x 222, 225 (3d Cir. 2010).